Opinion by Judge SIDNEY R. THOMAS; Dissent by Judge BYBEE.
OPINION
THOMAS, Circuit Judge:
Daniel Millis challenges his conviction under 50 C.F.R. § 27.94(a) for placing full, gallon-sized plastic bottles of water on trails in the Buenos Aires National Wildlife Refuge to help alleviate exposure deaths among undocumented immigrants crossing into the United States. Millis concedes that he placed water on refuge *915 trails, but argues that his actions did not violate § 27.94(a). We have jurisdiction under 28 U.S.C. § 1291 and reverse Millis’s conviction.
I
On February 22, 2008, United States Fish and Wildlife Service Officers Allen Kirkpatrick and Scott Kozma observed four individuals in a Toyota 4Runner while patrolling in the Buenos Aires National Wildlife Refuge. As Kirkpatrick approached the vehicle, he noticed several gallon-sized plastic bottles of water through the lowered back window; the back window was then remotely raised.
In the 4Runner were Daniel Millis and three other volunteers from “No More Deaths,” an organization that provides humanitarian aid to migrants. One such service is the placement of water in the desert along frequently traveled routes for unlawful entrants into the United States. Millis, the driver of the 4Runner, later testified that he had placed water on the refuge on at least several dozen occasions. He also testified that he had raised the back window when Kirkpatrick approached to make visible his “NoMoreDeaths.org” decal.
Upon questioning, Millis admitted that the volunteers had been placing plastic bottles of water on refuge trails, but indicated that they had also picked up discarded empty bottles. Kirkpatrick responded that the group’s actions constituted littering and requested that the group retrieve the bottles. Kirkpatrick later testified that litter problems had placed the refuge on a list of the ten most imperiled national wildlife refuges in the country. According to his testimony, the refuge remains the last habitat in the United States for the masked bobwhite quail and houses other endangered plant and animal species.
Kirkpatrick also informed Millis that special permits were required to leave water on the refuge and that a permit application to place gallon-sized plastic bottles of water on the refuge would be denied. According to his testimony, refuge managers had granted another organization, Humane Borders, a special use permit to keep large water drums on the refuge. One of these drums was located less than two miles away. Also in close proximity was a United States Border Patrol rescue beacon.
After the volunteers retrieved three bottles of water on a nearby trail, the officers drove off in an eastbound direction on Brown Canyon Road. Soon, Kirkpatrick noticed fresh tire marks on the side of the road alongside another trail and suspected the volunteers had left bottles in that area as well. Kirkpatrick exited the car to recover the bottles and instructed Kozma to stop the 4Runner if it passed, which he did. The witnesses gave differing accounts o'f the conversation that followed. Kozma testified that he told the volunteers to meet him on the next trail where they had placed water. Millis testified that Kozma told the volunteers to meet him on the next trail where they had placed water that would be easy to retrieve.
The officers again drove eastbound on Brown Canyon Road, expecting to meet the volunteers at the next trail that had bottles of water. They noticed fresh tracks and stopped and recovered bottles from the next two trails. However, .the volunteers did not stop. Believing that the volunteers had not complied with their instructions and were leaving the refuge, the officers decided to locate them and issue a citation.
The officers encountered the 4Runner and its occupants for the third time further east on Brown Canyon Road. Millis and the three passengers were standing outside the 4Runner. Millis testified that *916 they had picked up several bottles at this location and believed themselves to have complied with Kozma’s instructions.
The officers disagreed. Kirkpatrick issued Millis a citation for “Disposal of Waste” on a national wildlife refuge, as a first offense, in violation of 50 C.F.R. § 27.94(a) and asked Millis for the location of any remaining plastic bottles of water. Millis produced a notebook that detailed the volunteers’ water drop route. The notebook included GPS coordinates for each drop off spot and a numbering system. The numbers listed in the notebook corresponded to numbers written on the bottles alongside the date “2/22/08.” In total, officers retrieved seventeen bottles of water from refuge trails and seized several more from the back of the 4Runner, for a total of twenty-five.
At his bench trial, Millis admitted that he had placed the bottles of water on the refuge. However, he testified that leaving water out for illegal immigrants constitutes humanitarian aid and that “humanitarian aid is never a crime.”
The magistrate judge found Millis guilty of the charge and imposed a suspended sentence. Millis appealed to the district court, contending that the placement of bottles of purified water on a national wildlife refuge does not violate § 27.94(a) as a matter of law. The district court affirmed Millis’s conviction.
II
We review questions of law de novo. United States v. Cabaccang, 332 F.3d 622, 624-25 (9th Cir.2003) (en banc). The regulation under which Millis was convicted, 50 C.F.R. § 27.94, is entitled “Disposal of Waste” and provides that:
(a) The littering, disposing, or dumping in any manner of garbage, refuse sewage,[1] sludge, earth, rocks, or other debris on any national wildlife refuge except at points or locations designated by the refuge manager, or the draining or dumping of oil, acids, pesticide wastes, poisons, or any other types of chemical wastes in, or otherwise polluting any waters, water holes, streams or other areas within any national wildlife refuge is prohibited.
(b) Persons using a national wildlife refuge shall comply with the sanitary requirements established under the provisions of this Subchapter C for each individual refuge; the sanitation provisions which may be included in leases, agreements, or use permits, and all applicable Federal and State laws.
Millis concedes that he placed water on refuge trails, but argues that his conduct did not violate § 27.94(a) because the bottles of purified water did not constitute “garbage, refuse sewage, sludge, earth, rocks, or other debris” within the meaning of the regulation. The United States counters that the bottles constitute “garbage.”[2]
We begin by noting that the rule of lenity “requires courts to limit the reach of criminal statutes to the clear import of *917 their text and construe any ambiguity against the government.” United States v. Romm, 455 F.3d 990, 1001 (9th Cir.2006); see also United States v. Miranda-Lopez, 532 F.3d 1034, 1040 (9th Cir.2008). The rule of lenity applies “only where ‘after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute.’ ” United States v. Nader, 542 F.3d 713, 721 (9th Cir.2008) (quoting Smith v. United States, 508 U.S. 223, 239, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). In such a case, fundamental principles of due process mandate that “no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited.” Nader, 542 F.3d at 721 (citation and internal quotation marks omitted).
We next turn to the language of the regulation. When construing a word, we generally construe the term in accordance with its “ ‘ordinary, contemporary, common meaning.’ ” Cleveland v. City of L.A., 420 F.3d 981, 989 (9th Cir.2005) (quoting San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.2004)). To that end, we may consider a dictionary definition. See id.; see also Mac’s Shell Serv., Inc. v. Shell Oil Prods. Co., — U.S. -, 130 S.Ct. 1251, 1258, 176 L.Ed.2d 36 (2010) (using dictionary definitions to inform statutory construction of words). Webster defines “garbage” as “food waste” or “discarded or useless material.” Webster’s Collegiate Dictionary 480 (10th ed. 1996).[3] “Discard,” in turn is defined as “1: to get rid of, esp. as useless or unpleasant.” Id. at 330. Applying those definitions in the present context, the text of § 27.94(a) is ambiguous as to whether purified water in a sealed bottle intended for human consumption meets the definition of “garbage.”[4], [5]
A second fundamental canon of construction is that words must be read in their context, with a view to their place in the overall regulatory scheme, and to “ ‘fit, if possible, all parts into an harmonious whole.’ ” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting FTC v. Mandel Bros., Inc., 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959)). There is little doubt that the overarching purpose of the underlying statute and implementing regulations is the conservation, management, and restoration of wildlife and natural habitats. Pursuant to the 1997 Refuge Improvement Act:
The mission of the [National Wildlife Refuge] System is to administer a na *918 tional network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans.
16 U.S.C. § 668dd(a)(2). In administering the System, the Secretary is instructed to “ensure that the mission of the System ... and the purposes of each refuge are carried out,” id. at § 668dd(a)(4)(D); “plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System,” id. at § 668dd(a)(4)(C); and to “ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans,” id. at § 668dd(a)(4)(B). Additional uses of System areas are permitted only if the Secretary of the Interior “determines that such uses are compatible with the major purposes for which such areas were established.” Id. at § 668dd(d)(1)(A); see also 50 C.F.R. § 26.41. As the district court correctly noted, therefore, the intent of the regulatory scheme is to prevent the disposal or abandonment of unauthorized property on refuge land.
However, the structure of the regulatory scheme achieves that end in a number of ways. Section 27.94(a), as we have noted, forbids the “littering, disposing, or dumping in any manner of garbage, refuse sewage, sludge, earth, rocks, or other debris.” Another provision prohibits “[abandoning, discarding, or otherwise leaving any personal property in any national wildlife refuge.” 50 C.F.R. § 27.93. A third provision anticipates that some property might be placed in the refuge upon receipt of a special use permit. 50 C.F.R. § 25.41; see also 50 C.F.R. § 25.42 (requiring the exhibition of permits upon request). The structure of the regulatory scheme thus suggests that § 27.94(a) was not intended to be a comprehensive implementation of the Congressional mandate to minimize human impact on wildlife refuges; rather, it formed part of a larger regulatory scheme.[6] Indeed, as the government concedes, special use permits have been granted to allow the placement of water drums within the refuge for humanitarian purposes.
The narrow question we consider today is whether the term “garbage” within the context of the regulation was sufficiently ambiguous that the rule of lenity would apply in this case. Here, given the common meaning of the term “garbage,” coupled with the regulatory structure, we conclude that § 27.94(a) is sufficiently ambiguous in this context that the rule of lenity should apply. Millis likely could have been charged under a different regulatory section, such as abandonment of property or failure to obtain a special use permit. However, that is not the question presented here. The only question is whether the rule of lenity should be applied to the offense charged. We conclude that it does apply, and we reverse the judgment of the district court.
REVERSED.

. The term "refuse sewage” is not separated by a comma. See 41 Fed.Reg. 9166, 9171 (March 3, 1976).

. We would have no problem affirming Millis’s conviction if, as the dissent contends, § 27.94 prohibited " 'littering' in a wildlife refuge or disposing of or dumping ‘garbage, refuse sewage, sludge, earth, rocks, or other debris.' ” However, that is not the text of the regulation. Rather than generally prohibiting littering, § 27.94 governs "Disposal of Waste.” In subsection (b), it requires compliance with applicable "sanitation provisions.” In subsection (a), it prohibits specifically the "littering ... of garbage, refuse sewage, sludge, earth, rocks, or other debris.”

. Other dictionaries are in accord. See, e.g., Random House Webster’s Collegiate Dictionary 540 (2000) (defining "garbage” as "1. discarded animal and vegetable matter, as from a kitchen. 2. any matter that is no longer wanted or needed; trash. 3. anything that is contemptibly worthless, inferior, or vile”); Oxford English Dictionary, vol. 6, at 363-64 (2d ed. 2001) (defining garbage as "2. Refuse in general; filth").

. The Supreme Court's decision in United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), does not compel a different result. At issue in Standard Oil was a "broad and inclusive” statute prohibiting the depositing in a body of water of "any refuse matter of any kind or description whatever.” Id. at 229, 86 S.Ct. 1427. In deciding the case, the Supreme Court observed that "[m]ore comprehensive language would be difficult to select.” Id. The regulation at issue here is decidedly more narrow.

. Nor do we, contrary to the assertion of the dissent, settle upon a definition of "garbage” that turns on an item’s value, rather than whether it was discarded. Under either interpretation, application of the regulation to Millis's conduct involves significant ambiguity. See, e.g., Waste Mgmt. of the Desert, Inc. v. Palm Springs Recycling Ctr., Inc., 7 Cal.4th 478, 28 Cal.Rptr.2d 461, 869 P.2d 440, 442-43 (1994) (considering the notion of value in construing the term "discarded” to interpret California’s Waste Management Act) (citations omitted).

. Thus, we do not hold that "any number of objects (for example, sleeping bags, packaged food, clothing, flashlights, plastic bags, or shoes) can be left in the wildlife refuge." The abandonment of such items may well be prohibited by other regulations applicable to refuge lands, including 50 C.F.R. § 27.93, § 25.41, and § 25.42.